1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   VINCENT MALLORY,                    No. CIV S-06-0247-CMK

12              Plaintiff,

13      vs.                              MEMORANDUM OPINION AND ORDER

14   MICHAEL J. ASTRUE,[1]
     Commissioner of Social Security,

15              Defendant.

16   _____/

17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. §

20   405(g). Pursuant to the consent of the parties, this case is before the undersigned for final

21   decision on plaintiff's motion for summary judgment (Doc. 16) and defendant's cross-motion for

22   summary judgment (Doc. 17).

23   / / /

24   _____

25          [1]      Pursuant to Federal Rule of Civil Procedure 25(d), Michael J. Astrue is
     substituted for his predecessor.  The Clerk of the Court is directed to update the docket to reflect
26   the above caption.

# I. BACKGROUND

Plaintiff applied for disability insurance benefits on March 14, 2003, based on disability.  In his application, plaintiff claims that his disability began on March 1, 2002. Plaintiff claims the following combination of physical impairments result in his disability:

> . . . He suffers from chronic back and neck impairments (degenerative disc disease, chronic cervical spondylosis, deconditioning and muscle imbalance in the cervicothoracic scapular region, cervical radiculopathy, disc bulge at C6-7 level, herniated cervical disc, herniated lumbar disc, arthritis, cervical spine, straightening of the cervical alignment. C6-7 disc bulging crowding the descending spinal cord, diminished ulnar nerve or C8 root conduction velocity, significant disc lesion at C6-7) causing severe and chronic pain, decreased range of movement in his neck, back, and legs, difficulty swallowing, and severe headaches.  He suffers from chronic hand and arm impairments (peripheral neuralgia, decreased grip strength, bilateral hand numbness, bilateral carpal tunnel syndrome, cubital tunnel syndrome) causing chronic right arm pain, hand pain and loss of strength, forearm pain and loss of strength, tingling sensation of the hands, and numbness of the hands.

Plaintiff also lists various mental impairments which contribute to his disability:

> . . . He suffers from mental illness (severe, recurrent major depressive disorder, personality disorder with anti-social traits, bereavement issues, adjustment disorder, narcissistic traits) causing severe mood swings, excessive forgetfulness, suicide attempt and suicidal ideation, inability to associate with other people normally, including excessive irritability.

Plaintiff is a United States citizen born January 20, 1963, with a high school equivalency.

## A.    Summary of the Evidence

As indicated above, plaintiff claims both physical and mental impairments.

### 1.    Physical Impairments

The certified administrative record ("CAR") contains medical records regarding plaintiff's physical impairments from the following sources:  (1) Sacramento Fire Services (CAR 147); (2) Sutter General Hospital (CAR 149-63); (3) Aubrey A. Swartz, M.D. (CAR 205-11); (4) Steve McInture, M.D. (CAR 237-40); (5) Rita B. Bermudez, M.D. (CAR 142-44); (6) Sacramento County Department of Health and Human Services (CAR 212-17); (7) Phillip

Orisek, M.D. (CAR 229-36); (8) Daniel Powers, M.D. (CAR 178-81); (9) Stephen Dell, M.D. (CAR 182-89); (10) Allen Hassan, M.D. (CAR 190-204, 263-65); (11) Department of Veterans Affairs (CAR 350-83); and (12) Patrick Bianchi, M.D. (CAR 241-48).   What follows is a chronological review of these records.

Dr. Bermudez conducted an electromyography study and examination on January 24, 2001.  The examination revealed the following:

> Grip strength is 71/73 pounds on the right and 95/93 pounds on the left. Phalens elicits mild tingling in the fingertips.  Reflexes are 1+ symmetric. Motor strength is intact to manual testing.  Sensation is decreased to pinwheel over the right index and long fingers.  He does not have any tenderness over the ulnar nerve at the cubital tunnel.  He does have decreased [range of motion] in the neck.

Dr. Bermudez concluded that the results of the nerve conduction study were "within normal limits" except that "right median distal sensory latency was prolonged."  Overall, Dr. Bermudez opined:

> This study demonstrates a focal neuropathy of the right median nerve at the wrist consistent with right carpal tunnel syndrome.  There is no electrodiagnostic evidence of ulnar neuropathy, plexopathy, or radiculopathy.  Clinical correlation is required.

The record contains treatment notes from Sacramento County Department of Health and Human Services dated April 9, 2001, April 10, 2001, May 1, 2001, and June 27, 2001.[2]  The court accepts plaintiff's summary of these notes, as follows:

> Clinic notes of April 9, 2001, indicate that Mr. Mallory was taking Vicodin and Motrin as needed for pain in his lower back and neck.
> Clinic notes of April 10, 2001, indicate that Mr. Mallory was treated for right arm pain and neck pain.
> Clinic notes of May 1, 2001, indicate that on the basis of the results of a clinical examination, Mr. Mallory was diagnosed with both right carpal tunnel syndrome and arthritis at C6-7.  He was prescribed Vioxx in addition to his current medication.
> Clinic notes of June 27, 2001, indicate that Mr. Mallory was experiencing numbness of the right hand and low back pain.  On the basis

---

[2]   Additional records from this source are discussed below.

1   of the examination made by the clinician, Mr. Mallory was diagnosed with
2   cervical spondylosis and peripheral neuralgia.

3   Sacramento Fire Services responded to emergency call at plaintiff's house on
4   September 1, 2001.  Plaintiff had been hit on the head with a large (2' x 2') piece of plaster that
5   had fallen from his ceiling.  Emergency responders noted that plaintiff was dizzy and that his
6   right arm was numb.  It was also noted that plaintiff experienced tingling and weakness in his
7   right index and middle fingers which progressed to his thumb.

8   Plaintiff was treated at Sutter General Hospital from September 1, 2001, through
9   September 13, 2001, in connection with the September 1st accident.  The emergency department
10   report indicates that plaintiff reported good health and that he was not taking any medication on
11   a regular basis.  Plaintiff also denied any drug use.  The physical examination revealed the
12   following:

13   . . . Examination of the head did reveal some mild erythema and
     tenderness in the right occipital area.  No swelling, deformity, or
14   fluctuance.  Eyes:  Pupils equal, round, and reactive to light and
     extraocular muscles are intact. . . .  Mouth and throat are clear.  NECK:
15   Supple. . . .  NEUROLOGIC:  Deep tendon reflexes are equal bilaterally
     and the cranial nerves appear to be intact.  There is no motor deficit.
16   There is some possible hypesthesia on the dorsum of the right hand in the
     area of the thumb and second finger.

17

18   The emergency room doctor concluded that there did not appear to be any significant injury to
19   the spinal cord or spinal column and that plaintiff had a good range of motion and no significant
20   pain with movement.  The discharge diagnoses were blunt head trauma and acute cervical strain
21   versus contusion.  Plaintiff was discharged with bed rest instructions and advised to take
22   Ibuprofen for pain.

23   Dr. Hassan, who is plaintiff's primary treating physician, performed an
24   examination on October 1, 2001, following the September 2001 accident.[3]  In his Medical

25   _____

26   [3]      Additional records from Dr. Hassan are discussed below.

4

Accident Report, Dr. Hassan describes plaintiff's September 1, 2001, accident as follows:

> The patient was . . . in the kitchen . . . washing dishes when a 2' x 2' piece
> of plaster fell on the back of his head and neck, knocking him out.

When he saw Dr. Hassan following the accident, plaintiff complained of numbness in his right arm and right side of his body.  He also reported difficulty swallowing and breathing since the accident.  Plaintiff reported low back pain, and discomfort in his hip and right leg.  He also reported migraine headaches and trouble sleeping associated with neck pain.  In addition, plaintiff reported sexual dysfunction related to upper back pain, neck pain, and stress.  Dr. Hassan described a "prior episode of upper back and neck problems with numbness to the right arm."  Dr. Hassan noted:

> [Plaintiff] recalls he was driving home from Lake Tahoe and experienced
> some numbness into his right upper extremity and neck.  He had an
> evaluation which included NCV studies of his right upper extremity.
> Those studies are not currently available.  This occurred in 1999.  The
> studies were done in 2000.  He had been seen, at that time, by a lady
> doctor in a Med Clinic.  He was apparently sent to the lady by the
> Sacramento County Medical Clinic on Stockton and Broadway in
> Downtown Sacramento.

It is not clear whether the NCV study by the "lady doctor" refers to Dr. Bermudez' January 2001 study.

On physical examination, Dr. Hassan made the following objective observations concerning plaintiff's cervical spine:

> Shows a normal lordosis, normal dorsal kyphosis, no apparent scoliosis,
> and a normal lumbosacral lordosis.  Flexing the head anterior and to the
> left precipitates discomfort/fullness in the throat as well as discomfort into
> the left shoulder.  Lhermitte's Test is positive.  There is palpable
> tenderness into the paracervical, trapezius, scalenus anticus/medius/
> posticus and sternocleidomastoid muscles bilaterally.

Dr. Hassan observed decreased cervical ranges of motion of 5 to 20 degrees.  Grip strength on the right was 50% reduced as compared to the left.  As to the lumbosacral spine, Dr. Hassan reported negative sitting and supine straight-leg raising and Gaenslen's Test results. Lumbosacral range of motion was normal except for flexion, which was reduced 10 degrees

1  from expected normal, and extension, which was reduced 20 degrees from expected normal.  Dr.

2  Hassan concluded that he needed to evaluate the records further and obtain an MRI.

3              Dr. Powers performed a MRI scan on October 9, 2001.  He reported the following

4  conclusions:

5              1.    Straightening of the cervical alignment – compatible with post-traumatic
                    ongoing musculoligamentous spasm;
6
7              2.    C6-7 greater than C2-3 through C5-6 deteriorative disc level changes with
                    C6-7 disc space narrowing, bony spurring, uncinate process hypertrophy
                    and limited anteroinferior C6 and posterosuperior C7 vertebral body
8                   edema/toxin/granulation response (Grade II+); and

9              3.    Slight to moderate wide-based C6-7 bulging crowding the descending
                    spinal cord within the central canal (Grade II+).
10

11             The record also contains Dr. Hassan's progress notes from October 15, 2001, and

12  December 7, 2001.  On October 15, 2001, Dr. Hassan noted the following subjective complaints:

13             This gentleman states his upper back and neck pain, as well as right
               arm/wrist pain, has persisted.  Of biggest concern are headaches at the
14             base of the skull which radiate over the back of the head and some mid-
               back and low back pain.  He has had a MRI scan, but those studies are not
15             presently available.  The concern is whether there is radiculopathy to the
               right.
16
               * * *
17
               . . . The discomfort radiates to the scalp and behind the eyes.  He also
18             states he has some low back pain, but no pain radiates to the legs or feet.
               He states the numbness and tingling in the right hand is "always there,
19             never goes away."

20  Dr. Hassan concluded that further studies were needed in order to render an opinion.

21             By December 7, 2001, Dr. Hassan had reviewed the MRI scan and nerve

22  conduction velocity study data and offered the following conclusions:

23             As far as I can tell, the major damage in this gentleman had been
               secondary to this recent injury though it would have been helpful to have a
24             MRI scan on a prior occasion. . .

25             * * *

26             This patient certainly has the lesion we expected.  The anterior protrusion

6

1   significantly interferes with swallowing, causing his dysphagia, and the
2   posterior lesion, of course, is impacting the spinal canal.  [¶] The nerve
    conduction velocity studies performed reveal abnormal median motor
    nerve as well as bilateral carpal tunnel syndrome, left greater than right.
3   But note, probable C6, C7 lesion with noted abnormal ulnar motor
    slowing across the elbows, consistent with cubital tunnel syndrome, left
4   greater than right.  Radiculopathy is certainly compatible with the lesion
    we see and he should see a neurosurgeon for consultation, although, at this
5   time, he likely would not be considered a surgical candidate, but I can
    foresee surgery.

6

7       Plaintiff was referred to Dr. Dell by his treating physician, Dr. Hassan, for a

8   neurological consultation, which was performed on January 16, 2002.  Dr. Dell noted the

9   following objective findings and conclusions:

10      **Spinal:**  Normal for age and habitus.  Normal thoracic, thracolumbar and
        lumbosacral curves with preserved thoracic kyphosis and lumbar lordosis.
11      Despite the patient's paravertebral symptoms in the thoracic interscapular
        (T3-T7) and thoracolumbar (T12-L3) areas, examination today reveals no
12      paravertebral or dorsal spinous pain, tenderness, or low grade spasm to
        palpation or percussion in thoracic, lumbar, or sacral areas.  Iliolumbar
13      and sacroiliac ligaments, sciatic notch, pyriform triangle, and posterior
        superior iliac crests not tender to deep palpation.  No prominence of . . .
14      pain about the sacral ala or coccyx, which are nontender to deep palpation.
        Thoracolumbar and lumbosacral range of motion is normal to flexion,
15      extension, lateral flexion, and rotation.  The patient can bend to touch toes
        standing and seated.  Straight leg raising is negative to 90 degrees, reverse
16      straight leg raising is negative to -40 degrees, both symmetrically.
        Lasegue's sign negative.  Flexion essentially identical in standing, seated,
17      and supine (SLR) positions.

18  Dr. Dell concluded that plaintiff has improved somewhat since his September 1, 2001, injury and

19  that his prognosis is favorable.  He stated that plaintiff should be allowed another four months

20  for further improvement with conservative treatment.  Dr. Dell did not think that plaintiff would

21  be a neurosurgical candidate within the foreseeable future.

22      The record contains additional progress notes from Dr. Hassan dated February 8,

23  2002, and May 20, 2002.  (12-8-2004).  on February 8, 2002, Dr. Hassan noted that plaintiff

24  reported that he was ". . . able to get into retraining for electronics."  Dr. Hassan advised plaintiff

25  to avoid twisting, turning, stooping, squatting, bending, and lifting repetitively.  He also noted

26  plaintiff's complaints of "some coldness in the thumb" which he opined could indicate "some

7

peripheral vasopastic disorder. . . ." By May 20, 2002, plaintiff had obtained a job as an electrician and plaintiff complained that, any time he looks upward or backward, he tends to get more neck pain. Dr. Hassan stated that the MRI revealed "significant disc lesion at C6-7 with a moderate wide-based disc that crowds the descending spinal cord within the central canal." The doctor indicated that, while plaintiff is probably a surgical candidate at this point, he was going to proceed with conservative treatment. Dr. Hassan provided plaintiff with stronger pain medications.

On August 21, 2002, Dr. Swartz performed an independent medical examination.[4] Dr. Swartz reported that the present injury resulted from a 3' x 3' piece of plaster, not the 2' x 2' reported in all the prior records. As to medication, Dr. Swartz reported that plaintiff takes no medications other than Motrin. Plaintiff reported that he developed stiffness in his neck in 1999 with subsequent numbness and tingling in the right upper extremity and right hand, but that those problems "had gone away by July 2001." Plaintiff reported the following complaints as of the date of the examination by Dr. Swartz:

> Mr. Mallory described stiffness and an ache in the neck, numbness in the right thumb, index, and middle fingers, tingling in the right arm at times, weakness in the right arm, and occasional headaches which are primarily frontal. He states that sometimes he forgets things but his concentration does not appear to have been affected. He notices that he is irritable at times and has been told that same thing by others. He has no dizziness.

Dr. Swartz concluded that plaintiff "has chronic degenerative disc bulge at the C6-7 level with chronic cervical spondylosis with associated deconditioning and muscle imbalance involving the cervicothoracic periscapular region. In addition, he has carpal tunnel syndrome in the right hand." With respect to plaintiff's complaints of pain prior to the September 1, 2001, accident, Dr. Swartz noted "[plaintiff] claims he was asymptomatic until September 1, 2001." Dr. Swartz opined that the cost to address plaintiff's injuries resulting from the September 1, 2001, accident

---

[4]    It appears that this examination was requested by plaintiff's attorney at the time in connection with possible litigation arising from the September 1, 2001, accident.

1    would be approximately $54,900.00.

2            The record also contains additional treatment notes from Sacramento County

3    Department of Health and Human Services from December 3, 2002 and March 27, 2003.  These

4    records, however, are not legible.

5            Dr. Bianchi, an agency consultative physician, completed a physical residual

6    functional capacity assessment on June 4, 2003.  This assessment is not included in plaintiff's

7    summary of the evidence.  As to plaintiff's residual functional capacity, Dr. Bianchi opined that

8    plaintiff could:  occasionally lift up to 20 pounds and frequently lift up to 10 pounds and

9    stand/walk/ sit for about 6 hours in an 8-hour day.  He also concluded that plaintiff was limited

10   with respect to upper extremity pushing and pulling.  Dr. Bianchi stated that plaintiff could

11   frequently climb, balance, stoop, kneel, crouch, and crawl.  As to medical evidence supporting

12   this last conclusion, Dr. Bianchi made the following note:  ". . . tender & tight in L/S region . . .

13   & mildly restricted motion of . . . spine . . . ."  For manipulative limitations, Dr. Bianchi opined

14   that plaintiff's ability to reach, handle, finger, and feel is limited.  Dr. Bianchi did not opine any

15   visual, communicative, or environmental limitations.  The doctor noted that no treating or

16   examining source materials regarding plaintiff's physical capabilities were in his file.

17           Dr. Orisek, plaintiff's treating orthopedic surgeon, conducted orthopedic spine

18   examinations on July 21, 2003, August 4, 2003, and October 20, 2003.  Following the July 21,

19   2003, examination, Dr. Orisek reported the following pain complaints:

20           [Plaintiff] has daily constant pain, severe and sharp, shooting at times.  he
             is unable to work.  He is totally disabled by the pain.  He must greatly
21           limit his activities and avoid many things to control the pain.  Pain in the
             cervical area  ranges from 7-9 and in the low back area 7-9 as well.  This
22           is out of a 10 point scale.  Pain diagram shows pain in the mid posterior
             neck area with pain radiating down the right arm with numbness in the
23           right hand.  There is some pain in the left shoulder, pain in the lumbar area
             with posterior buttock and thigh pain.  Any activities exacerbate his
24           symptoms.  The patient has needed to use a cane to walk with because of
             his pain.  The patient denied a previous history of similar pain complaints.
25

26   On physical examination, Dr. Orisek noted that there were no deformities (such as kyphosis or

scoliosis) of the neck, thoracic, or lumbar spine areas.  He observed that plaintiff's range of motion in his neck was mildly to moderately decreased due to pain.  Dr. Orisek also noted a decreased range of motion in the low back due to pain.  Motor strength and gait were normal.

Dr. Orisek examined plaintiff again on August 4, 2003, and reported that the results had not changed.  Dr. Orisek diagnosed herniated discs at C6-7, L4-5, and L5-S1.  Plaintiff was examined by Dr. Orisek again on October 20, 2003.  Dr. Orisek reported that the examination results were unchanged.  He concluded that plaintiff was "completely disabled because of . . . pain" and that surgery was now a "reasonable possibility."

Dr. McIntire performed an agency consultative neurologic examination on March 7, 2004.  On examination, Dr. McIntire noted that plaintiff "walks differently at different times during the exam and pre and post exam period."  He also indicated that, while plaintiff uses a cane, the "present exam does not suggest the need for a cane."  Dr. McIntire offered the following functional assessment:

> Subjectively, the claimant has a history of an injury that occurred when he was at home and plaster fell onto his head when he was in his kitchen.
>
> Objectively, there were not clear findings of the present exam of a cervical or lumbar radiculopathy or a myelopathy.  He does, however, have loss of range of motion of the cervical and lumbar spine as described.  As indicated, gait was not physiological.
>
> Given the loss of range of motion, the claimant should avoid heavy lifting or carrying of not more than 20 pounds frequently or 40 pounds occasionally.  The current exam itself does not point to additional specific functional limitations.  There are no limitations in terms of time sitting, standing, or walking.  There are no postural, manipulative, environmental, communicative, or cognitive limitations suggested by the present exam.

Plaintiff was treated for his physical impairments at the Department of Veterans Affairs by Dr. Shyamal K. Maitra, M.D.[5]  The record contains Dr. Maitra's treatment notes from July 14, 2004, and August 4, 2004.  The July 14, 2004, notes from plaintiff's initial examination

---

[5]     Additional records from Dr. Maitra are discussed below.

1   indicate that the exam was "not significant."  The August 4, 2004, note indicates that plaintiff

2   was involved in an auto accident on July 7, 2004.  Dr. Maitra noted that plaintiff's exam was

3   "not significant."

4           On December 8, 2004, Dr. Hassan completed another progress note – the most

5   recent such note from this medical provider contained in the file – in which Dr. Hassan states:

> [The plaintiff] returns to the office today stating that his low back pain is
> worse than ever and has had no improvement in spite of therapy and
> medications.  Dr. Orisek indicated he was a surgical candidate because of
> Grade III+ discs at L4-5 and L5-S1.  At this time he is still having a lot of
> pain in his upper back and neck and we note that there is an MRI scan of
> 10/9/2001 that shows multilevel degenerative disc changes C6-7 greater
> than C2-3 and C3-4, C4-5, C5-6.  There is disc space narrowing at C6-7
> and uncinate process hypertrophy, anterior C6 and posterior superior C7
> vertebral body edema toxin granulation response indicating an acute
> injury at that time.  The moderately wide based C6-7 disc is crowding the
> descending spinal cord in the central canal at a Grade II+.
>
> In light of these injuries, he has a permanent disability and if he were to
> work in the future he must be in a category that allows that his injuries
> result in a limitation to semi-sedentary work and contemplates that the
> individual can do work one-half the time in a sitting position and
> approximately one-half the time in a standing or walking position with
> minimum demands for physical effort, whether standing, walking, or
> sitting.

16          The record contains additional treatment notes from Dr. Maitra at the Department

17  of Veterans Affairs dated December 30, 2004.  As of the date of this note, Dr. Maitra still had

18  not reviewed plaintiff's medical records.  Dr. Maitra noted that plaintiff "does not at all look

19  distressed: but that plaintiff reported pain at 9 out of 10.  He noted that plaintiff's exam was "not

20  significant" except for pain symptoms.  On February 10, 2005, Dr. Maitra reported on MRI scan

21  results.  Dr. Maitra observed "[m]ultilevel degenerative change which are most evident at C6-7."

22  He concluded that there was no evidence of severe neurologic compromise and that the MRI

23  revealed only minor abnormality.   The record contains a transcribed note dated April 12, 2005,

24  in which Dr. Maitra stated that he "did not think that disability was appropriate" and that

25  plaintiff's "exam was not very significant" when he was last seen in December 2004.

26  ///

2.   <u>Mental Impairments</u>

As to plaintiff's mental impairments, the file contains records from the following sources:  (1) Bradley Daigle, M.D. (CAR 222-28); (2) Sacramento County Mental Health Treatment Center (CAR 265-94); (3) Rosemary Tyl, M.D. (CAR 249-62); (4) Tin Z. Shain, M.D. (CAR 349-82); and (5) Ronald E. Allen, a clinical psychologist (CAR 349-82).

Dr. Daigle performed an agency consultative psychiatric examination on August 5, 2003.  At the time of the examination, plaintiff reported that he was applying for social security benefits ". . . on the basis that his right and left arms and neck have been injured."  Dr. Daigle reported the following history:

> Mr. Mallory was apparently already off work because of grief over the loss of his grandparents about two years ago.  He states that he was also abusing cocaine rather heavily and regards himself as a "crack addict" for a period of two to three years.  Consequently, he was not able to work in his usual capacity as an electrician.  He eventually got into a rehabilitation program and a recovery house in March 2003 and has been living there and attending six NA meetings per week since then with maintained abstinence. . . .  He states that he is still somewhat troubled by the loss of his grandparents and in addition to this, his mother is apparently now dying of liver cancer.  He states that he is handling this reasonably well and would be working if not for his physical injuries.  He is under the care of a surgeon, Dr. Orisek.

Dr. Daigle concluded that, while plaintiff reported some minor depressed moods, he did not think plaintiff required any kind of mental health treatment.  Dr. Daigle offered the following functional assessment:

> 1.   Not significantly limited in ability to understand, remember, and carry out simply 1 or 2-step job instructions;
>
> 2.   Not significantly limited in ability to follow detailed and complex instructions;
>
> 3.   Not significantly limited in ability to relate and interact with supervisors, co-workers, and the public;
>
> 4.   Slightly limited in ability to maintain concentration and attention, persistence and pace;

/ / /

5.    Slightly limited in ability to associate with day-to-day work activity, including attendance and safety; and

6.    Slightly limited in ability to adapt to the stresses common to a normal work environment.

He assigned plaintiff a global assessment of functioning ("GAF") rating of 70 out of 100.

Dr. Tyl, an agency psychiatrist, completed a mental capacity review and assessment on August 22, 2003.  As with Dr. Bianchi's physical residual functional capacity assessment, this mental capacity assessment is also not included in plaintiff's summary of the evidence.  Dr. Tyl concluded that plaintiff had no severe mental impairment.  She opined that plaintiff had adjustment disorder, mild depressed mood, and uncomplicated grief.  She did not note more than a mild limitation in any area of mental functioning.

On April 12, 2004, plaintiff attempted to commit suicide by overdosing on Flexeril and possibly Vioxx.  Following emergency treatment at the University of California Medical Center in Sacramento, plaintiff was discharged to Sacramento County Mental Health "because of our grave concern that he may still be suicidal."  There are no references to plaintiff's suicide attempt in any of the records discussed above relating to plaintiff's physical problems.

Following the April 12th suicide attempt, plaintiff was treated at Sacramento County Mental Health Treatment Center.  While these records are largely illegible, the court observes that, on April 14, 2004, plaintiff was assigned a GAF of only 35.  It appears that, by this time, plaintiff was taking Lexapro for depression.

Plaintiff was also treated by clinical psychologist Ronald Allen at the Department of Veterans Affairs on August 6, 2004, and September 29, 2004.  On August 6, 2004, Dr. Allen noted that  there was "[n]o evidence of any suicidal or homicidal thoughts or obvious psychotic symptoms."  He assigned a GAF of 50.  By September 29, 2004, plaintiff's GAF had increased to 60 and Dr. Allen noted only mild impairment and a significant response to treatment.

/ / /

1    Dr. Shain, a psychiatrist at the Department of Veterans Affairs, also treated

2  plaintiff on September 29, 2004, October 6, 2004, and December 17, 2004.  On December 17,

3  2004, Dr. Shain reported that plaintiff had requested a letter to support his social security

4  disability claim.  Dr. Shain added Diazepam to treat anxiety.  Dr. Shain then wrote a letter that

5  same day which  indicates:

> This is to certify that Mr. Vincent Mallory has been under my care for his
> chronic mental illness diagnosed as Major Depressive Disorder, receiving
> medications and supportive therapies, at VA Mather Mental Health
> Outpatient Clinic.
>
> Currently, Mr. Mallory's mental illness was aggravated by his medical
> condition and physical disabilities, with no capacity to obtain or maintain
> any gainful employment, at least for the next twelve months.  He was
> recommended to maintain more frequent mental health services, and was
> observed to be compliant with our treatments.

12   **B.**    **Procedural History**

13   Plaintiff's claim was initially denied.  Following denial of his request for

14  reconsideration, plaintiff requested an administrative hearing, which was held on December 15,

15  2004, before Administrative Law Judge ("ALJ") Robert K. Rogers, Jr.

16   In his June 28, 2005, decision, the ALJ made the following findings:

> 1.   The claimant met the disability insured status requirements of the Act on
> March 1, 2002, the date the claimant stated he became unable to work, and
> continues to meet them through the date of this decision;
>
> 2.   The claimant has not engaged in substantial gainful activity since March
> 1, 2002;
>
> 3.   The medical evidence establishes that the claimant has severe
> degenerative disc disease of the cervical and lumbar spine, but that he
> does not have an impairment or combination of impairments listed in, or
> medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4;
>
> 4.   The claimant's testimony that he has extreme problems with
> concentration, poor memory, or that he otherwise could not perform a full
> level of light exertion, as described here, cannot be credited because such
> allegations are not shown to be a reasonable consequence of his medically
> determinable severe impairments;

26  ///

14

5.      The claimant has the residual functional capacity to perform the physical exertion requirements of a full range of light work; there are no non-exertional limitations;

6.      The claimant is unable to perform his past relevant work;

7.      The claimant has the residual functional capacity to perform the full range of light work;

8.      The claimant is 42 years old, which is defined as a younger individual;

9.      The claimant has a high school education;

10.     In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material;

11.     Section 404.1569 of Regulation No. 4 and section 416.969 of Regulation No. 16 and Rules 202.20, 202.21, and 202.22 of Appendix 2, Subpart P, Regulation No. 4, direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled; and

12.     The claimant was not under a disability as defined in the Social Security Act, at any time through the date of this decision.

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits. After the Appeals Council declined review on December 3, 2005, this appeal followed.

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986);

15

1   Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the

2   Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See

3   Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the

4   administrative findings, or if there is conflicting evidence supporting a particular finding, the

5   finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th

6   Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation,

7   one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas

8   v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

9   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338

10  (9th Cir. 1988).

11

12                                   **III.  DISCUSSION**

13          In his motion for summary judgment, plaintiff argues:  (1) the ALJ failed to

14  protect his interests as someone appearing without representation; (2) the ALJ improperly

15  rejected the opinions of the treating physicians and mischaracterized the medical evidence,

16  thereby resulting in a failure to consider all of plaintiff's impairments in the severity

17  determination; and (3) the ALJ erred in applying the "Grids" given the existence of non-

18  exertional limitations.

19          **A.      Protection of Plaintiff's Interests**

20          Plaintiff, who was not represented by counsel during administrative proceedings,

21  argues that the ALJ failed to protect his interests in several ways.  He asserts:  (1) the ALJ failed

22  to provide meaningful advice on the benefits of being represented by counsel; (2) the ALJ failed

23  to make plaintiff aware of the nature of the proceedings or the showing required to establish

24  disability; (3) the ALJ failed to properly develop the record.

25  / / /

26  / / /

1          1.     Development of the Record

2          The ALJ has an independent duty to fully and fairly develop the record and assure

3    that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

4    Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be

5    especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously

6    and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v.

7    Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding

8    that the record is inadequate triggers this duty.  See id.  The ALJ may discharge the duty to

9    develop the record by subpoenaing the claimant's physicians, submitting questions to the

10   claimant's physicians, continuing the hearing, or keeping the record open after the hearing to

11   allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th

12   Cir. 1998)).

13          The court will consider plaintiff's most general argument first.  As to plaintiff's

14   contention that the ALJ failed to properly develop the record, plaintiff makes two related

15   arguments.  Plaintiff asserts the ALJ failed to:  (a) elicit information regarding plaintiff's medical

16   treatment, his impairments, and limitations; and (b) obtain all known relevant sources of medical

17   information.

18          The hearing transcript flatly contradicts both of these contentions.  At the

19   conclusion of the ALJ's questioning of plaintiff, he realized that relevant medical records were

20   not in the file.   The following exchange occurred:

21                Q:     Okay, here's what I'm going to do then, just to be safe.
      I'm going to give you until February 1st to get me the meds, the records
22    from both the physical and mental doctor.  Now you know what?  Even
      though you don't have an appointment with this guy until January, you're
23    allowed to go over there and say, "I'd like to get a copy of my file."
                A:     Okay.
24                Q:     And they'll give it to you anyway.  I mean, you don't have
      to see a doctor for that.  Once you get that stuff, then you can give it back
25    to us, and then I'll look at it. . . .  Because what's going to happen next is,
      I'm probably going to write them a letter and say, "I need your opinion on
26    these issues."  And then I'll, you'll get a copy, and you'll see what I send

17

> [t]o him and all. And if you can get that done, the quicker you can get that done, the better. Like, if you don't have to wait until December 30th to get it in. I mean, I, I'll probably want you to bring me that extra stuff too when it happens. But to get a picture of where you are now, I just need to look and see what exists now.

The ALJ went even further:

> Q: . . . And then here, I'll give you a little list of what we want. . . . [¶] . . . I'm going to tell you just another thing here. If you need help, call area code 916, 566-7200 extension 266, ask for Kim, K-I-M. She will help you. Tell her that Judge Rogers told you to do this. Okay, once I get that stuff in, I'll, then I'll, then the ball comes back in my court.

The ALJ concluded by closing the hearing, but leaving the record open.

This hearing testimony clearly reflects that the ALJ fulfilled his duty to obtain all relevant medical evidence. Further, the certified administrative record before this court shows that numerous records were received into evidence after the hearing. In particular, those records include documents from Sacramento County Mental Health, the Department of Veterans Affairs, and University of California Medical Center in Sacramento, where plaintiff was taken following the April 12, 2004, overdose.

        2.    <u>Advice on Benefits of Representation by Counsel</u>

With respect representation by an attorney, the following exchange took place:

> Q: Mr. Mallory, in the Notice of Hearing we sent you, we told you you have the right to representation at this hearing. It is not required that you have a representative, but it is your right. Have you tried to get one?
> A: Yes.
> Q: And who did you talk to? What happened?
> A: I don't remember his name. It was somebody down, down at Lo[aves] and Fishe[]s, and he said it was too late, that my case was too far along, so he wouldn't take it.
> Q: Okay. Like I say, you have a right to representation at the hearing. I don't care if you have a representative or not. It makes no difference to me, but you have to understand this will be the only hearing you get on this application. If you are unsuccessful here today representing yourself and you decide later you should have had professional help and you ask for a second chance at this hearing, we will not give it to you. So you have to decide now if you would like additional time to get a representative, or if you wish to proceed on your own.
> A: I wish to proceed.

1        Plaintiff argues his waiver of counsel was insufficient because, given medical

2 evidence of mental impairments, the ALJ had a heightened obligation to explain the benefits of

3 proceeding with counsel.  According to plaintiff, the foregoing exchange demonstrates that,

4 contrary to his duty, the ALJ actually discouraged plaintiff from obtaining counsel by stating that

5 it made no difference whether he had counsel or not.  Plaintiff also asserts that "[i]t is clear that

6 Mr. Mallory did not want to proceed without counsel, and had, in fact, expressed an unequivocal

7 desire to be represented as evidenced by his futile attempt to obtain counsel."  Under the ALJ's

8 "heightened duty," plaintiff asserts the ALJ should have made sure he understood:  (a) the best

9 way to find counsel; (b) the nature and usage of contingency fee agreements; and (c) the

10 possibility of obtaining free counsel, and the benefits of counsel.[6]

11        Again, the record belies any error.  The ALJ informed plaintiff that he has a right

12 to representation and gave him the chance to ask for extra time to obtain counsel.  Plaintiff

13 declined and said that he wanted to proceed.  Moreover, the court finds that plaintiff was not

14 prejudiced by the lack of representation in this case.  He did not run into any procedural barriers

15 and his case does not involve particularly complex analysis or involve a cutting-edge issue.  The

16 record shows that the ALJ provided plaintiff with assistance in obtaining all his medical records

17 and that, in fact, plaintiff was able to obtain and submit the records.

18        3.    Nature of the Proceedings and Showing Required to Establish Disability

19        Finally, plaintiff claims that the ALJ erred by not explaining to him that the ALJ's

20 role was "to 1. develop all facts and circumstances that were relevant to Mr. Mallory's case,

21 facts and circumstances that cut both for and against Mr. Mallory, and 2. develop arguments for /

22 / / /

23 / / /

24

---

25      [6]    Plaintiff would also have the ALJ act as counsel.  According to plaintiff, the heightened duty required the ALJ to use the "facts and circumstances to develop arguments for

26 Mr. Mallory."

1   and against findings that Mr. Mallory was disabled."  Plaintiff then offers pure speculation:

2           Armed with this information, Mr. Mallory may have been able to
3       provide more meaningful testimony.  He could have been more aggressive
        in demanding that all of his medical evidence be properly brought before
        the court.  He also would have been better able to judge whether he was
4       getting a fair hearing.

5   The only argument plaintiff makes which refers to any facts in the record is that, "after

6   delivering an uninterrupted, two-page speech on the nature of the hearing," the ALJ failed to ask

7   plaintiff whether he understood what he had said.

8           By referring to the "two-page speech" on the nature of the hearing, plaintiff

9   concedes that the ALJ did, in fact, fulfill his duty to describe the nature of the proceedings.  As

10  to plaintiff's more specific argument that the ALJ did not ask whether he understood the speech,

11  plaintiff fails to account for his response to the speech, which was to express some confusion

12  regarding some paperwork.  Plaintiff did not ask the judge to explain something again because

13  he did not understand.  Finally, plaintiff's speculation that he might have been able to be more

14  aggressive in demanding that his medical records be made a part of the record only has traction

15  if, in fact, all the medical evidence was <u>not</u> presented to the ALJ.  Because all the available

16  evidence was adduced – and plaintiff does not argue otherwise – plaintiff simply could not have

17  been prejudiced by any lack of "aggression."

18          **B.      Evaluation of the Medical Evidence**

19          Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of

20  his treating physicians by mischaracterizing the medical record.  Plaintiff concludes that this

21  error resulted in a flawed analysis at step two regarding the severity of plaintiff's physical

22  impairments.  Specifically, plaintiff contends that the ALJ failed to properly credit the opinions

23  of Drs. Orisek, Hassan, and Swartz concerning:  (1) inability to swallow; (2) carpal tunnel

24  syndrome and resulting decreased grip strength in right hand; and (3) pain.  Plaintiff does not

25  / / /

26  / / /

1   argue that the ALJ erred in concluding that his mental impairments were not severe.[7]

2          In order to be entitled to benefits, the plaintiff must have an impairment severe

3   enough to significantly limit the physical or mental ability to do basic work activities.  See 20

4   C.F.R. §§ 404.1520(c), 416.920(c).[8]   In determining whether a claimant's alleged impairment is

5   sufficiently severe to limit the ability to work, the Commissioner must consider the combined

6   effect of all impairments on the ability to function, without regard to whether each impairment

7   alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

8   1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

9   or combination of impairments, can only be found to be non-severe if the evidence establishes a

10  slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

11  Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

12  1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

13  impairment by providing medical evidence consisting of signs, symptoms, and laboratory

14  findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

15  is insufficient.  See id.

16         In reaching a step two severity finding, the ALJ must necessarily consider the

17  available medical opinions.  The weight given to medical opinions depends in part on whether

18  they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater,

19  81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a

20  treating professional, who has a greater opportunity to know and observe the patient as an

21  individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d

22

23         [7]     Plaintiff does argue, as discussed below, that his mental impairments constituted
       non-exertional limitations which triggered the requirement for vocational expert testimony.

24         [8]     Basic work activities include: (1) walking, standing, sitting, lifting, pushing,
       pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
25     carrying out, and remembering simple instructions; (4) use of judgment; (5) responding
       appropriately to supervision, co-workers, and usual work situations; and (6) dealing with
26     changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least

weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d

502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner

properly rejected a medical opinion the court considers whether: (1) contradictory opinions are

in the record; and (2) clinical findings support the opinions. The Commissioner may reject an

uncontradicted opinion of a treating or examining medical professional only for "clear and

convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831.

While a treating professional's opinion generally is accorded superior weight, if it is contradicted

by an examining professional's opinion which is supported by different independent clinical

findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035,

1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be

rejected only for "specific and legitimate" reasons supported by substantial evidence. See

Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough

summary of the facts and conflicting clinical evidence, states her interpretation of the evidence,

and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent

specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or

examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining

professional, without other evidence, is insufficient to reject the opinion of a treating or

examining professional. See id. at 831. In any event, the Commissioner need not give weight to

any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d

1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported

opinion); see also Magallanes, 881 F.2d at 751.

As to plaintiff's claimed inability to swallow (dysphagia), plaintiff points to Dr.

Hassan's assessment that plaintiff suffered from lesions causing this problem. Dr. Hassan,

however, did not opine that this problem was severe or that it limited plaintiff's ability to work.

1  Therefore, the ALJ did not err in omitting this problem from the list of plaintiff's severe

2  impairments.

3           As to carpal tunnel syndrome and decreased grip strength in the right hand, Dr.

4  Bermudez observed in January 2001 a "focal neuropathy of the right median nerve at the wrist

5  consistent with right carpal tunnel syndrome."  In December 2001, Dr. Hassan concluded that

6  nerve conduction velocity studies reveal abnormal median motor nerve as well as bilateral carpal

7  tunnel syndrome, left greater than right.  In August 2002, Dr. Swartz concluded that plaintiff has

8  carpal tunnel syndrome in the right hand.  Agency consultative physician Dr. Bianchi opined that

9  plaintiff's ability to reach, handle, finger, and feel is limited.   In contrast, Dr. McIntire

10  concluded that plaintiff had no manipulative limitations.   The ALJ, however, did not address

11  this conflict in the medical opinions.  In particular, the hearing decision does not set forth

12  specific and legitimate reasons for accepting Dr. McIntire's opinion over those of the other

13  doctors.[9]

14           As to pain, plaintiff contends that the ALJ failed to properly consider Dr. Orisek's

15  October 20, 2003, opinion that plaintiff was disabled because of pain.  Given that the ALJ did

16  not conclude that plaintiff was disabled due to pain, it follows that the ALJ must have rejected

17  this opinion.  The hearing decision, however, contains no rationale for doing so.  As to Dr.

18  Orisek, the ALJ stated:

19           [Plaintiff] returned to orthopedic surgeon Philip Orisek, M.D., in July
             2003, at which time he was still complaining of neck pain with radiation
20           into the arm and numbness.  The assessment was that his symptoms would
             not likely improve with conservative treatment and thus cervical
21           discectomy and fusion at C6-7 were recommended.  The orthopedist
             reaffirmed his opinion for the need of surgery in October 2003.
22

23  The ALJ does not discuss anywhere in the hearing decision Dr. Orisek's opinion that plaintiff's

24  pain was disabling.

25  _____

26      [9]        Interestingly, the ALJ rejected Dr. Bianchi's conclusion in this regard.

23

1        It may well be that the ALJ believed that Dr. Orisek's opinion concerning the

2   effect of plaintiff's pain was not supported by clinical findings.  However, this court cannot

3   guess at the basis for the ALJ's decision to reject Dr. Orisek's opinion in this regard.  The law is

4   clear that, absent specific and legitimate reasons, the ALJ must defer to the opinion of a treating

5   physician, such as Dr. Orisek.  Because the ALJ did not provide <u>any</u> reasons for rejecting Dr.

6   Orisek's opinion concerning plaintiff's pain, the court finds that remand is appropriate in order

7   to provide the ALJ an opportunity to fully evaluate this opinion and to provide reasons for

8   rejecting it.

9        Other evidence concerning pain is what plaintiff says – his subjective complaints

10  to doctors, his testimony, and any other statements of record.  Thus, the court will also consider

11  the ALJ's credibility finding.  The ALJ stated:

12          Although the claimant does have severe cervical and lumbar spine
            disorders that would reasonably prevent him from performing more than
13          light exertional work activities, the evidence presented here nevertheless
            shows that, despite his impairments, the claimant remains quite functional
14          in view of his wide-ranging daily activities.

15  The ALJ then found that plaintiff's testimony was not credible:

16          The claimant's testimony that he . . . could not perform a full level of light
            exertion . . . cannot be credited because such allegations are not shown to
17          be a reasonable consequence of his medically determinable severe
            impairments.
18

19  Thus, the ALJ appears to have rejected plaintiff's statements concerning pain because they were

20  not consistent with the objective evidence.

21        The Commissioner determines whether a disability applicant is credible, and the

22  court defers to the Commissioner's discretion if the Commissioner used the proper process and

23  provided proper reasons.  See <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

24  credibility finding must be supported by specific, cogent reasons.  See <u>Rashad v. Sullivan</u>, 903

25  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See <u>Lester v. Chater</u>, 81 F.3d

26  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

1   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

2   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

3   credible must be "clear and convincing."  See id.

4          If there is objective medical evidence of an underlying impairment, the

5   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

6   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

7   341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

8   the symptoms alleged, including aggravating factors, medication, treatment, and functional

9   restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

10  the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

11  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

12  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

13  physician and third-party testimony about the nature, severity, and effect of symptoms.  See

14  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

15         Here, the ALJ found that plaintiff's testimony was not credible but did not

16  identify the testimony that was found to be not credible or the evidence which undermined

17  plaintiff's credibility.  Moreover, the ALJ appears to have rejected plaintiff's credibility as

18  inconsistent with the objective evidence.  As stated above, this is not a sufficient reason where,

19  as here, there is objective evidence of an underlying impairment.  For these reasons, the court

20  concludes that remand is also appropriate in order to provide the ALJ an opportunity to consider

21  plaintiff's credibility concerning pain in more detail.

22      **C.    Application of the Grids**

23         The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

24  disability for various combinations of age, education, previous work experience, and residual

25  functional capacity.  The Grids allow the Commissioner to streamline the administrative process

26  and encourage uniform treatment of claims based on the number of jobs in the national economy

1  for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

2  460-62 (1983) (discussing creation and purpose of the Grids).

3       The Commissioner may apply the Grids in lieu of taking the testimony of a

4  vocational expert only when the grids accurately and completely describe the claimant's abilities

5  and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

6  Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

7  Grids if a claimant suffers from non-exertional limitations because the Grids are based on

8  strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a

9  claimant has an impairment that limits his or her ability to work without directly affecting his or

10  her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

11  the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

12  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

13  even when a claimant has combined exertional and non-exertional limitations, if non-exertional

14  limitations do not impact the claimant's exertional capabilities.[10]  See Bates v. Sullivan, 894 F.2d

15  1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

16  / / /

17

18     [10]    Exertional capabilities are the primary strength activities of sitting, standing,
walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
19  perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
20  and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
21  a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
22  with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
23  with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
24  100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
See 20 C.F.R. § 404.1567(e) and 416.967(e).
25     Non-exertional activities include mental, sensory, postural, manipulative, and
environmental matters which do not directly affect the primary strength activities.  See 20
26  C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

26

1      In cases where the Grids are not fully applicable, the ALJ may meet his burden

2  under step five of the sequential analysis by propounding to a vocational expert hypothetical

3  questions based on medical assumptions, supported by substantial evidence, that reflect all the

4  plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

5  where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

6  ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

7  1341 (9th Cir. 1988).

8      Plaintiff argues that the ALJ erred in applying the Grids to reach a disability

9  determination because they are not fully applicable.  Specifically, plaintiff asserts that the

10  existence of non-exertional limitations precludes application of the Grids.  According to

11  plaintiff:

12           In the case at bar, the evidence more than *suggested* that Mr.
         Mallory's disabling pain and mental illness . . . amounted to non-
13         exertional impairments resulting in significant limitations in his ability to
         work. . . .  In the face of Mr. Mallory's non-exertional impairments and
14         associated symptoms and limitations, the ALJ's use of the Grids was clear
         legal error.  (italics in original).

15

16  The basis of plaintiff's argument is that the "ALJ rejected the opinions of Drs. Hassan, Orisek,

17  Swartz, and clinic providers and failed to adequately assess the impact of Mr. Mallory's non-

18  exertional pain, mental impairments, symptoms, and limitations pursuant to Social Security rules

19  and regulations."  Plaintiff states the ALJ should have elicited the testimony of a vocational

20  expert.[11]

21      According to plaintiff, his "disabling pain and mental illness" constitute non-

22  exertional limitations not properly considered by the ALJ.   To demonstrate error, plaintiff must

23  show that his pain and mental impairments impact his exertional capabilities.

24  / / /

25

26      [11]    Plaintiff states that a vocational expert was scheduled to testify at the hearing but
    failed to appear.

27

1          1.     Mental Impairments

2          Plaintiff argues that the evidence in this case "more than suggested" that his

3   mental impairments amount to non-exertional limitations limiting his ability to work.  As to

4   plaintiff's mental impairments, the ALJ noted:

5              . . . Although the claimant has also been treated for depression, the
               medical records do not document any continuous 12-month period during
6              which the claimant has been treated for severe depression or other mental
               illness.  Rather, he has been seen very sporadically for apparent episodes
7              of decompensation in his mental status in association with stressors such
               as grief and his past drug addiction.  Otherwise, however, he has been
8              satisfactorily maintained on medication which has provided good control –
               as evidenced by the results of the consulting psychiatric examination.
9

10         The court finds no error in this analysis.  In August 2003, agency consultative

11  psychiatrist Dr. Daigle did not think plaintiff required any kind of mental health treatment.  He

12  assigned plaintiff a GAF rating of 70 out of 100.  Also in August 2003, Dr. Tyl concluded that

13  plaintiff had no severe mental impairment.  She opined that plaintiff had adjustment disorder,

14  mild depressed mood, and uncomplicated grief, but did not note more than a mild limitation in

15  any area of mental functioning.  Following the April 12th suicide attempt, plaintiff was treated at

16  Sacramento County Mental Health Treatment Center where he was assigned a GAF of only 35.

17  By this time, plaintiff was taking Lexapro for depression.   By August 6, 2004, Dr. Allen noted

18  that  there was "[n]o evidence of any suicidal or homicidal thoughts or obvious psychotic

19  symptoms."  Dr. Allen assigned a GAF of 50.  By September 29, 2004, plaintiff's GAF had

20  increased to 60 and Dr. Allen noted only mild impairment and a significant response to

21  treatment.

22         Dr. Shain is the only doctor who opined a more severe limitation.  In December

23  2004, Dr. Shain opined that plaintiff had ". . . no capacity to obtain or maintain any gainful

24  employment, at least for the next twelve months."  The ALJ, however, properly discounted this

25  contradicted opinion because, as the ALJ stated in the hearing decision, Dr. Shain did not

26  provide any reasons in support of the conclusion of disability.  See Meanel, 172 F.3d at 1113.

1    The ALJ properly concluded that plaintiff's mental impairments did not preclude

2  application of the Grids.

3        2.    Pain

4    As discussed above, the court concludes that the ALJ erred in two respects

5  concerning plaintiff's complaints of disabling pain.  First, the ALJ failed to properly consider the

6  opinion of Dr. Orisek.  Second, the ALJ failed to properly consider plaintiff's credibility.

7  Because the ALJ's analysis may change on remand, it would be premature to express an opinion

8  at this time as to whether plaintiff's pain precludes application of the Grids.

9

10        **IV.  CONCLUSION**

11    For the foregoing reasons, this matter will be remanded under sentence four of 42

12  U.S.C. § 405(g) for further development of the record and further findings addressing the

13  deficiencies noted above.

14    Accordingly, IT IS HEREBY ORDERED that:

15        1.    Plaintiff's motion for summary judgment is granted;

16        2.    The Commissioner's cross motion for summary judgment is denied;

17        3.    This matter is remanded for further proceedings consistent with this order;

18  and

19        4.    The Clerk of the Court is directed to enter judgment and close this file.

20

21  DATED:   July 25, 2007.

22

23                          _____

24                          **CRAIG M. KELLISON**
                            UNITED STATES MAGISTRATE JUDGE

25

26